# CASTELLANI LAW FIRM, LLC

450 Tilton Road, Suite 245
Northfield, New Jersey 08225

DAVID R. CASTELLANI
*Certified by the Supreme Court*
*of New Jersey as a Civil Trial Attorney*

Phone: (609) 641-2288
Fax: (609) 641-2299
*david@castellanilaw.com*
Tax I.D. No.: 20-3743893

April 6, 2018

Clerk
**UNITED STATES DISTRICT**
**COURT OF NEW JERSEY**
Mitchell H. Cohen, U.S. Courthouse
1 John F. Gerry Plaza, 4th & Cooper Streets
Camden, NJ 08101

> Re:   Zampetis v. City of Atlantic City, et al
>         NJ District Court Case #: 1:15-cv-01231-NJH-AMD
>         **Requests Oral Argument**

Dear Sir/Madam,

I have enclosed and original and one (1) copy of a Notice of Motion To Compel Documents in this matter.

If you have any questions, or need for additional information, please do not hesitate to contact me or a member of my staff.

Very truly yours,

/s/David R. Castellani
DAVID R. CASTELLANI

DRC/k

cc:   Nicholas Zampetis
        Todd J. Gelfand, Esquire *(via email only)*
        Tracy Riley, Esquire *(via email and regular mail)*

Page **1** of 23

**CASTELLANI LAW FIRM, LLC**
David R. Castellani, Esquire - ID #: 023691991
450 Tilton Road, Suite 245
Northfield, New Jersey 08225
(609) 641-2288
Attorneys for Plaintiff(s)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| **NICHOLAS J. ZAMPETIS** | : |
| | : |
| | : |
| | : **CIVIL No.: 1:15-cv-01231-NLH-AMD** |
| **v.** | : |
| | : |
| **CITY OF ATLANTIC CITY, POLICE** | : |
| **OFFICER IVAN LOPEZ, POLICE** | : |
| **OFFICER ANTHONY ALOSI, JR.** | :**PLAINTIFF'S MOTION TO COMPEL** |
| **POLICE OFFICER MIKE AUBLE, and** | : |
| **JOHN DOE ATLANTIC CITY POLICE** | : |
| **OFFICERS 1-5, INDIVIDUALLY AND** | : |
| **IN THEIR OFFICIAL CAPACITY,** | : |
| **JOHN DOES 1-5** | : |
| | : |
| | : |

To:   Rachel Conte, Esquire
      **LAW OFFICES OF RILEY & RILEY**
      The Washington House
      100 High Street, Suite 302
      Mount Holly, New Jersey 08060

      Todd Gelfand, Esquire
      **BARKER, GELFAND & JAMES**
      Linwood Greene – Suite 12
      210 New Road
      Linwood, New Jersey 08221

      **TAKE NOTICE** that the undersigned will apply to the above-named Court, located at

United States District Court, District of New Jersey, as soon as counsel may be heard for an Order

Page **2** of **23**

to compel Defendants to supply any and all documents as requested in a Supplemental Notice to

Produce dated August 30, 2017 upon the following grounds:

    See attached Brief in Support of Motion.

the undersigned:

( )    waives oral argument and consents to disposition on the papers.
( )    does not request oral argument at this time.
**(x)    requests oral argument.**

A proposed form of Order is annexed.

Dated:   April 6, 2018

                                   DAVID R. CASTELLANI, ESQUIRE

**CASTELLANI LAW FIRM, LLC**
David R. Castellani, Esquire - ID #: 023691991
450 Tilton Road, Suite 245
Northfield, New Jersey 08225
(609) 641-2288
Attorneys for Plaintiff(s)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **NICHOLAS J. ZAMPETIS** :<br>:<br>:<br>: **CIVIL No.: 1:15-cv-01231-NLH-AMD**<br>**v.** :<br>:<br>**CITY OF ATLANTIC CITY, POLICE** :<br>**OFFICER IVAN LOPEZ, POLICE** :<br>**OFFICER ANTHONY ALOSI, JR.** :<br>**POLICE OFFICER MIKE AUBLE, and** :<br>**JOHN DOE ATLANTIC CITY POLICE** : **CERTIFICATION OF EXHIBITS**<br>**OFFICERS 1-5, INDIVIDUALLY AND** :<br>**IN THEIR OFFICIAL CAPACITY,** :<br>**JOHN DOES 1-5** :<br>:<br>: | |

I, David R. Castellani, of full age and being duly sworn according to law, upon his oath,

hereby certifies that the exhibits attached to Plaintiff's Motion To Compel is as follows:

1.) Exhibit A – Plaintiff's Supplemental Notice to Produce directed to Defendants.

2.) Exhibit B  - Shane Testimony in <u>Stadler v City of Atlantic City</u>.   pgs 2402 to 2457
And pgs 2452 to 2466.

3.) Exhibit C - pages 4 and 5 of the Shane report in <u>Costantino v. the City of Atlantic City</u>.
To be provided.

Date: April 6, 2018

DAVID R. CASTELLANI
Attorney for Plaintiff

**CASTELLANI LAW FIRM, LLC**
David R. Castellani, Esquire - ID #: 023691991
450 Tilton Road, Suite 245
Northfield, New Jersey 08225
(609) 641-2288
Attorneys for Plaintiff(s)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **NICHOLAS J. ZAMPETIS** | : |
| | : |
| | : |
| | : |
| | : **CIVIL No.: 1:15-cv-01231-NLH-AMD** |
| **v.** | : |
| | : |
| **CITY OF ATLANTIC CITY, POLICE** | : |
| **OFFICER IVAN LOPEZ, POLICE** | : |
| **OFFICER ANTHONY ALOSI, JR.** | : |
| **POLICE OFFICER MIKE AUBLE, and** | : |
| **JOHN DOE ATLANTIC CITY POLICE** | : **CERTIFICATION OF COUNSEL** |
| **OFFICERS 1-5, INDIVIDUALLY AND** | : |
| **IN THEIR OFFICIAL CAPACITY,** | : |
| **JOHN DOES 1-5** | : |
| | : |
| | : |

    1.     I am an attorney licensed to practice law in the State of New Jersey and am the attorney for the Plaintiff in the above entitled action.

    2.     As part of initial discovery requests, I requested among other documents all IA files for ACPD officers from 2005 to 2015. Defendant City of Atlantic City refused to provide the same.

    3.     Counsel appeared at Rule 37 conference and was directed to brief the issues.

    4.     Attached as *Exhibit A* are Plaintiff's supplemental Notice to Produce and a followup letter requesting the IA files.

5.     Attached as *Exhibit B* are portions of Plaintiff's expert Jon Shane's trial testimony in <u>Stadler v. City of Atlantic City, et al</u>.

6.     Plaintiff has referenced Dr. John Shane's reports in <u>Costantino</u> which will be produced in redacted form as *Exhibit C*.

7.     Plaintiff will request the court impose the sanction of attorney's fees for the necessity of filing the within motion given the numerous other times similar courts have ruled on this issue in relation to identical claims made against the identical defendant to produce the same.

8.     Plaintiff relies upon the brief submitted with this Motion and any reply brief submitted.

9.     Plaintiff also requests oral argument with respect to this Motion.

Date: April 6, 2018

DAVID RA CASTELLANI
Attorney for Plaintiff

**CASTELLANI LAW FIRM, LLC**
David R. Castellani, Esquire - ID #: 023691991
450 Tilton Road, Suite 245
Northfield, New Jersey 08225
(609) 641-2288
Attorneys for Plaintiff(s)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **NICHOLAS J. ZAMPETIS** | : |
| | : |
| | : |
| | : **CIVIL No.: 1:15-cv-01231-NLH-AMD** |
| **v.** | : |
| | : |
| **CITY OF ATLANTIC CITY, POLICE** | : |
| **OFFICER IVAN LOPEZ, POLICE** | : |
| **OFFICER ANTHONY ALOSI, JR.** | : |
| **POLICE OFFICER MIKE AUBLE, and** | : **BRIEF IN SUPPORT OF MOTION** |
| **JOHN DOE ATLANTIC CITY POLICE** | : |
| **OFFICERS 1-5, INDIVIDUALLY AND** | : |
| **IN THEIR OFFICIAL CAPACITY,** | : |
| **JOHN DOES 1-5** | : |
| | : |
| | : |
| | : |

Plaintiff Nicholas Zampetis by and through his attorney David R. Castellani of Castellani

Law Firm moves to compel Defendant City of Atlantic City and the individual Defendant police

officers to produce the following discoverable documents requested via Plaintiff's Supplemental

Notice to Produce documents directed to the Defendant City of Atlantic City on August 30, 2017

and again in a subsequent letter dated January 29, 2018: (1) Internal Affairs complaints filed

against all ACPD officers for excessive use of force, assault, false arrest from 2005 to present (2)

all Internal Affairs complaints for all officers filed with the ACPD between 2005 to present. The

Defendant City of Atlantic City has refused to provide such documents requested and a Rule 37

conference has been completed and Defendant is on notice of Plaintiffs' application for counsel fees as a result of their failure to provide the discovery necessitating the current motion.

## BACKGROUND FACTS

1.       Plaintiff originally filed a complaint pursuant to 42 U.S.C. §1983 after he was brutally assaulted by three (3) Atlantic City police officers, Defendant Anthony Alsoi, Defendant Michael Auble and Defendant Ivan Lopez while attempting to leave the Tropicana Casino in Atlantic City New Jersey with a group of friends outside a bus in the valet parking area.

2.       Approximately four (4) to five (5) members of Plaintiff's group witnessed the brutal assault upon Plaintiff including the use of fists, kicks and baton strikes to the Plaintiff's body causing him serious and permanent injuries including a fractured nose, permanent disfigurement with breathing difficulties, concussion, post-concussion syndrome, post-traumatic stress syndrome among others.

3.       Two (2) eyewitnesses recently testified in deposition on April 4, 2018 that the Plaintiff was not resisting and was tackled from behind by police officers and beaten repeatedly with batons and with such force that it appeared to the witnesses, that the officers were intentionally trying to draw blood from the Plaintiff and to inflict permanent physical injuries.

4.       Plaintiff was charged with the disorderly persons offense, resisting arrest and assault on the officers and was tried as a criminal Defendant in the Atlantic City Municipal Court and was acquitted of all charges in the February 2015 by the Municipal Court Judge after hearing the eyewitness testimony and the testimony of the officers and the Plaintiff.

5.       Plaintiff after two (2) motions to dismiss Plaintiff's complaint filed by the City of Atlantic City filed a Second Amended Complaint which also included claims for common law and constitutional malicious prosecution as well as the common law also and constitutional claims for

the use of the unreasonable and excessive force in the arresting the Plaintiff

6.      In addition, in his Second Amended Complaint, Plaintiff alleges his constitutional rights were violated as a direct result of the Defendant City of Atlantic City having a permanent and well-settled practice or custom of allowing police officers including the named Defendants to employ the use of excessive force while effectuating an arrest, creating an atmosphere of illegal and unconstitutional behavior and deliberate, reckless disregard for the welfare of the public at large including the Plaintiff.

7.      Plaintiff further alleges in his Second Amended Complaint, Count Two, paragraph 10.  that Atlantic City and the Atlantic City Police Department had a well-settled practice of allowing police officers including the individual Defendants to falsely arrest and charge civilians without probable cause as a tool to conceal their own illegal and reasonable conduct.

8.      Plaintiff further alleged in his Second Amended Complaint in the Second Count paragraph 10, (g) that "Atlantic City and the Atlantic City Police Department have a permanent and well-settled practice of refusing to adequately respond and to investigate complaints regarding officer misconduct by the citizenry including, but not limited to, complaints regarding arrest procedures, and the use of excessive physical force, thus creating an atmosphere of illegal and unconstitutional behavior in deliberate indifference and reckless disregard of the welfare of the public at large including the Plaintiff. This is evident from the 509 excessive force complaints filed between 2005 and 2010 against the Atlantic City Police Department officers and the failure of Chief Jubilee or any other chief and/or the Internal Affairs Department from sustaining few with any of the 509 complaints.

9.      In an effort to develop and fortify Plaintiff's claims against the Defendant individual officers and the Defendant City of Atlantic City the Plaintiff has requested numerous

discoverable and clearly relevant documents pursuant to Fed. R. Civ. P. 26 the Defendants have

refused to produce the aforementioned documents. This motion to compel follows.

### LEGAL ARGUMENT

**PURSUANT TO FED. R. CIV. P. 26 (B) (1), "PARTIES MAY OBTAIN DISCOVERY REGARDING ANY NONPRIVILEGED MATTER THAT IS RELEVANT TO ANY PARTY'S CLAIM OR DEFENSE" AND "THE COURT MAY ORDER DISCOVERY OF ANY MATTER RELEVANT TO THE SUBJECT MATTER INVOLVED IN THE ACTION", ALTHOUGH "RELEVANT INFORMATION MAY NOT BE ADMISSIBLE AT TRIAL IF THE DISCOVERY APPEARS REASONABLY CALCULATED TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE." PEARSON V. MILLER, 211 F. 3D 57, 65 (3D CIR. 2000).**

The exact limits of Rule 26 relevance standards depend upon the context of each particular

action, and the determination of relevance is within the sound discretion of the District Court.

Importantly however, "courts have construed the Rule liberally creating a broad vista for

discovery." Oppenheimer Fund Inc. v. Sanders, 437 U.S. 340, 351 (1978). When a suit against

municipalities is based on Section 1983, the municipality can only be liable when the alleged

constitutional transgression implements or executes a policy, regulation, decision officially

adopted by the governing body or informally adopted by custom or practice. Monell v. New York

City Department of Social Services, 436 U.S. 658 (1978). See also Beck v. City of Pittsburgh, 89

F.3d 966, 971 (3d Cir. 1996). Although a municipality may not be held liable for a constitutional

violation under a theory of vicarious liability, it can be held responsible as an entity when the

injury inflicted is permitted under the adopted policy or custom. "An official policy must be the

moving force of the constitutional violation in order to establish the liability of a government body

under Section 1983". Or Remillard v. City of Egg Harbor, 424 F. Supp. 766, 771–72 (D.N.J. 2006).

A government policy or custom is established in two (2) ways. Policy is made when the

decision maker possessing final authority to establish municipal policy with respect to the action

issues an official proclamation, policy or edict. A course of conduct is considered a custom when, though not authorized by law such practices of state officials are so permanent and well settled as to virtually constitute law. Beck, 89 F.3d at 971.  In order to sustain a §1983 claim for municipal liability, the Plaintiff must simply establish a municipal custom coupled with causation, i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violation, and that their failure, at least in part, led to the injury. Id. at 972. Proof of the existence of an unlawful policy or custom alone is insufficient to maintain a §1983 action. Rather, the Plaintiff bears the burden of proving that the municipal practice was the proximate cause of the injury suffered. Id at n. 6.

To demonstrate causation, Plaintiff must show a "plausible nexus" or "affirmative link" between the municipalities custom and the specific deprivation of the constitutional right at issue. Bielevicz v. Dubinon, 915 F.2d 845,850 (3d. Cir. 1990). See also, City of Oklahoma v. Tuttle, 471 U.S. 808, 823 (1985). Thus, if the municipality is shown to have tolerated known misconduct by police officers, the issue of whether the municipalities inaction contributed to the officer's decision to act unlawfully is a question of fact for the factfinder. Id. Municipality's failure to act, once it is on notice that its procedures and policies are constitutionally deficient creates a fact question respecting causation. Id.

> **PLAINTIFF'S REQUEST FOR ALL INTERNAL AFFAIRS FILES FOR EVERY ATLANTIC CITY POLICE DEPARTMENT OFFICER FROM 2005 TO THE PRESENT, INTERNAL AFFAIRS COMPLAINTS FILED AGAINST ALL ACPD OFFICERS WHERE EXCESSIVE FORCE, ASSAULT, FALSE ARREST FROM 2005 TO THE PRESENT.**

In support of his claims for municipal liability recognized in Monell similar to the Plaintiff's in the previous cases of Castellani, Costantino, Harrison, Adams and most recently as recognized by the jury in the Stadler case, Plaintiff contends that the a ACPD's Internal Affairs

process is a sham and a pretense that offers no meaningful redress to the citizens of Atlantic City whose rights have been violated by the members of the Atlantic City Police Department. Plaintiff seeks the Internal Affairs files for every officer of the Police Department for the past 10 years. The Defendant's objections appear to be that the request is overbroad, not likely to lead to discoverable material and that no support exists for the request. However, Plaintiff is entitled to the Internal Affairs files for every City officer in the past 10 years or some shorter time determined by this court, or at a minimum, a representative sample to prove its Monell claim that Atlantic City has been deliberately indifferent to the widespread misconduct of its officers. To be certain, a federal jury in this district in the Stadler case made a specific factual finding that the City of Atlantic City was liable for condoning and acquiescing in a custom, practice and policy of permitting its officers to use excessive force in the effecting arrests during the same time period set forth in this Plaintiff's complaint.

The Plaintiff's expert in that case Dr. John Shane is the same expert that Plaintiff intends to utilize to conduct a similar analysis, if not identical analysis, as performed in the Stadler matter. This court should be aware that the Stadler incident took Place in February of 2013 and that the incident and attack of the Plaintiff by the Atlantic City police officers in this case took place on February 17, 2013 this same exact month as the incident in Stadler.

In Stadler, Dr. Shane conducted a two-part analysis initially choosing 33 random files from the files produced which were ordered by the court for the time period from 2004 to 2015. Dr. Shane testified that he relied on the random sample of 33 Internal Affairs cases for a qualitative analysis looking at the process by which Atlantic City Police Department conducts its Internal Affairs program. See Dr. Shane direct testimony in Stadler v. City of Atlantic City at page 2402 to 2457, March 6, 2018, attached as *Exhibit A.*

Page **12** of **23**

Dr. Shane also testified in the <u>Stadler</u> trial that he reviewed and had access to the Internal Affairs investigations much broader than the 2009 to 2013 time frame and in fact reviewed Internal Affairs files for the entire Police Department from 2004 to 2015. Based upon this analysis of the entire Internal Affairs files for the Police Department for the period of 2004 to 2015, Dr. Shane was able to formulate a statistical analysis and provide opinions concerning the percentages of complaints that involved the use of excessive force versus other complaints made as well as the percentage of complaints made by citizens or external complaints versus those made inter-departmentally or internal complaints. Dr. Shane was able to formulate opinions concerning how Atlantic City deviated from a national average which provided Dr. Shane a basis from which he testified that the entire Internal Affairs investigation process within the Atlantic City Police Department had gone astray and was severely deficient. From this data, Dr. Shane was also able to testify from his statistical findings that a reason for the same could be a bias existing within the organization in favor of officers compared to a bias against someone outside the organization such as a citizen and that the investigators within the Internal Affairs Department within the City of Atlantic City Police Department were somehow tipping the scales in favor of complaints generated inside the agency compared to outside the agency which is relevant to a well Plaintiff's claims in this case as well as to the cases previously cited many of which are pending before the Federal District Court in Camden concerning the inadequacy of Atlantic City's Internal Affairs process, the inadequacy of their Early Warning System including a lack of the same for the relevant time period all leading to an inference of a pattern, practice, policy and custom of condoning and/or acquiescing in its officers use of effect of excessive force in effecting arrests. ***Exhibit B.*** It was from this testimony that the jury in <u>Stadler</u> found Defendant City of Atlantic City liable under <u>Monell</u>. Dr. Shane's very testimony in <u>Stadler</u> and his statistical and quantitative analysis from

which he renders his opinions provides the very basis for Plaintiff's discovery requests.

Thus, Plaintiff's request for the Internal Affairs files for every City officer in the past 10 years or dating back to 2005 is clearly relevant to his burden to prove his <u>Monell</u> claim that the City had been deliberately indifferent to the widespread pattern, practice or custom of the use of excessive force amongst its police force in effecting arrests.

The District Court has already recognized in <u>Groark</u> that liability based on a custom rather than to formally adopt the policy proceeds on the theory that the relevant practice is so widespread as to have the force of law. 989 F. Supp. at 386. Custom may also be established by proof of knowledge and acquiescence. The Supreme Court has recognized that where a violation of federal rights is a highly predictable consequence of any inadequate custom in a situation likely to reoccur municipal liability may attach based upon a single application of the custom. <u>Id</u>. Simply showing a Plaintiff suffered a deprivation of constitutional rights will not permit an inference of municipal culpability and causation. <u>Id</u> at 386–87. Instead a Plaintiff must demonstrate that the municipal action was taken with deliberate indifference to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice. A pattern or a continued adherence to an approach that a municipality knows or should know was failed to prevent tortious conduct of police officers may establish the conscious disregard for the consequences of its actions necessary to trigger municipal liability. Deliberate indifference may also be shown if it is obvious that a policy or custom would lead to constitutional violations. Thus, given Plaintiff's recognizably high burden as set forth above, the Plaintiff should be entitled to the Internal Affairs files for all Atlantic City police officers from 2005 to the present or from 2005 to 2015. Similar to the court's findings in <u>Groark</u> (2014 US Dist. LEXIS 97 551 D.N.J. July 18, 2014) Plaintiff's claims against Atlantic City do not just focus on how Atlantic City addresses complaints against the individual officers but also

that the City has established, acquiesced and knew that its policies and procedures as to all of its police officers would violate citizen's constitutional rights. Thus, Plaintiff's claims are not just limited to how Atlantic City acts with respect to its particular officers named in the complaint, the actions in the Internal Affairs files of other officers are clearly relevant for discovery purposes not only for Plaintiff's expert to conduct the qualitative analysis that the Dr. Shane has previously performed in a number of cases before this court but also the statistical analysis which enabled Plaintiffs expert Dr. Shane to compare the national average in respect to particular categories of Internal Affairs complaints and also in relation to the statistical significance of the origin of the Internal Affairs complaints that being external v. internal and the percentage of or frequency of how often the complaints are sustained when made by citizens v. inter-departmentally. Stated differently, the Plaintiff is entitled to learn if the deficient Internal Affairs investigations Plaintiff has alleged are occurring within the City of Atlantic City Internal Affairs Division relate not just only to the individual Defendants but whether these investigations are reflective of a widespread deficiency within the Department giving rise to a custom pattern or practice necessary for municipal liability see Torres v. Kuzniasz 936 F. Supp. 1201, 1211 (D.N.J. 1996). Dr. Shane Plaintiff's proposed liability expert has indicated in previous reports that the "population's statistics includes all cases (100%) of a defined group that are being studied so that data driven conclusions can be drawn. Thus, all Atlantic City Police Department Internal Affairs cases are the "population". Dr. Shane has also indicated in his expert report within the case of Costantino v. City of Atlantic City "the population is preferred over a sample so that all cases of interest are represented and there is no error resulting from sampling. When the population of cases is known and available, as it is in this case, it is better to collect all of the cases instead of relying on a sample. This will ensure that no cases are skipped during sampling and there is no sampling error

introduced. See page 4. Dr. Shane also explains in his report in <u>Costantino</u> that "statistics are sensitive to low numbers. As such, statistical tests require a large amount of data to ensure the test is stable and does not produce inaccurate results. Internal Affairs investigations are in general a low-frequency event. Since these events do not occur as frequently as other less serious events, a large sample is necessary to capture as many serious cases as possible in the sample to ensure patterns can be identified. See page 4 and 5 of the Shane report in <u>Costantino v. the City of Atlantic City</u> attached hereto as ***Exhibit C***.

With the exception of <u>Groark,</u> Dr. Shane has been utilized as an expert in the <u>Stadler</u> case, the <u>Castellani</u> case, the <u>Costantino</u> and the <u>Adams</u> case, and all such cases have been subjected to scrutiny under summary judgment and summary judgment has been denied in each case relating to Plaintiff's <u>Monell</u> theories which are substantially similar and/or identical to the <u>Monell</u> theories pursued in the case before this court.

One focus of Plaintiff Zampetis' case similar to <u>Groark, Castellani, Costantino, Adams, Stadler</u> and <u>Harrison</u> in which summary judgment have all been denied on Plaintiff's <u>Monell</u> claims, is obviously the inadequacy of Atlantic City's police department's Internal Affairs process. In this respect, Plaintiff Zampetis as the other Plaintiffs is also taking issue with the legitimacy of the Atlantic City Internal Affairs process and the custom and practice of exonerating and failing to adequately monitor their police officers through defective Early Warning System.

As a Judge Schneider aptly recognized, in <u>Costantino v. City of Atlantic City</u> 152 F. Supp. 3d. 311 (2015), "although it should be obvious, in order to prove her <u>Monell</u> allegations it is essential to Plaintiff be permitted to review Atlantic City's IA files. Citing <u>Scouler v. Craig</u>, 116 F.R.D. 494, 496 (D.N.J. 1987) ("there can be no question of the relevancy of the IA files to the allegations of the complaint particularly where the complaint alleges inadequate supervision and

training under §1983). Further, as the court noted in Groark, 989 F. Supp. 2d at 393, "the requested IA files are fair game for discovery because they are directly relevant to Plaintiff's claim that Atlantic City's IA process is a sham and that Atlantic City failed to properly train its officers." Id at 394. This explains the remarkable fact that production of IA files is routinely ordered in §1983 cases. Costantino supra at 322. Moreover, as the court noted in Reed v. Cumberland Co. 34 F. Supp. 3d 396, 403 (D.N.J. 2013), "a Plaintiff must show why those prior incidents deserve discipline and how the misconduct in those situations was similar to the present one.". A Plaintiff cannot satisfy their burden of proving a Monell claim without looking at the content of Atlantic City's IA files. Judge Schneider in reviewing Plaintiff expert Dr. Shane's reports in Costantino noted: "Shane proposes to perform two (2) general types of analysis of Atlantic City's IA files: a process or a qualitative analysis and a multiple regression statistical analysis. As to the former, Shane will examine the IA files to evaluate Atlantic City's compliance with the applicable New Jersey's Attorney General Guidelines for conducting IA investigations. The statistical analysis will test Plaintiff's hypothesis and determine if certain conduct and actions were predictable. In general, Shane is "trying to capture… The overall picture of how Atlantic City's Internal Affairs investigations played themselves out" this will include an analysis of whether Atlantic City's IA process conforms to state and national norms. In this respect, Judge Schneider having reviewed Dr. Shane's reports and his testimony in that case found them sufficient to justify the Plaintiff's discovery request of all Internal Affairs file for all officers of the Atlantic City Police Department between 2004 and 2015. Indeed, Judge Schneider found that the Plaintiff's request was not out of line with IA productions in other cases. Citing Torres v. Kuzniasz 936 F. Supp. 1201, 1214 (D. N. J. 1996) (ordering production of 1200 files); Foley v. Boag C. A. No. 05 – 3727SRC 2006 WL6830911, at*3 (D. N. J. May 31, 2006) (requiring production of all Internal Affairs records

and complaints against all police officers in the Defendant municipality for 10 years).

In point of fact, Judge Schneider ordered the production of 721 randomly selective IA files. Although it hardly needs to be argued, and quite frankly at this point in time in 2018, (8) years after Groark requested the Internal Affairs files of all the police officers for the Atlantic City Police Department and five (5) years following the filing of Castellani v. City of Atlantic City, this court has a wealth of judicial precedent and opinion involving the City of Atlantic City Police Department, its Internal Affairs process and claims against its officers relating to the use of excessive force to be able to take judicial notice of the fact that the City's Internal Affairs processes is a sham, the City failed to properly train it's officers and that the Internal Affairs process was at the very least deficient resulting in an inordinate amount of the citizen's complaint not resulting in discipline. In fact, judicial notice of the City's tolerance of a long-standing custom and practice and policy of condoning its officers use of excessive force could be judicially noticed by this court given the factual finding made by the jury in Stadler v. City of Atlantic City on this issue in this particular case before this court. This is so as a result of both the Stadler and Zampetis incidents occurring in February 2013. Thus, while the issue of whether such a long-standing custom, practice and policy of condoning the use of excessive force to effect arrest by Atlantic City police officers was the cause of Plaintiff Zampetis' injury may still be reserved for jury, the city of Atlantic City will be in this case collaterally estopped from relitigating the issue of whether the custom and practice and or policy existed at the time of the Plaintiff's brutal assault.

In this respect, as recognized by Judge Schneider in Costantino, this court is not alone in finding that a preliminary showing has already been made that Atlantic City's IA process is deficient. Summary judgment motions have been denied in Cordial v. Atlantic City (which decision also called into question Atlantic City's IA process and the court wrote that the Plaintiff

presented evidence from which a reasonable jury could infer that Atlantic City's IA investigation process is designed to insulate the accused officers from penalty). Id at*6. The court also held in Cordial that from the evidence a reasonable jury could find that the IA investigations were insufficient were inadequate and that the Atlantic City exhibited deliberate indifference to the risk that its officers would use excessive force in a manner similar to that alleged there.

Finally, as was the conceded by defense counsel at the previous Rule 37 conference before this court, the City of Atlantic City at this juncture cannot argue prejudice in the production of such files as the same have already been committed to a portable hard drive and/or burned on the numerous CDs that have been produced in the at least 5 to 7 cases in both the state and federal courts in this state.

Accordingly, as the large sample of the Internal Affairs files for the entire Police Department requested by the Plaintiff is necessary for Plaintiff's expert John Shane to conduct an appropriate statistical and qualitative analysis of such files for purposes of rendering his opinion, Plaintiff respectfully requests that the court compel the Defendant to produce the same.

Parenthetically, prior to the filing of this motion, counsel for the Plaintiff, contacted counsel for the Defendant City of Atlantic City and the attempted to resolve this matter through an amendment to interrogatory answers enclosing the trial testimony of Plaintiff's expert Dr. John Shane at the Stadler v. City of Atlantic City trial portions of which are attached to this application as exhibits. Counsel for the City of Atlantic City has objected to the same forcing Plaintiff to proceed to file this motion for production of the files previously requested and which Dr. Shane has reviewed in total and from which he has made a random sample selection and conducted a qualitative and statistical analysis and has rendered opinions concerning identical Monell claims pled in this Plaintiff's complaint. Counsel for Defendant City of Atlantic City argues in this respect

that the Plaintiff's expert Dr. Shane cannot rely upon his previous trial testimony and the opinions he provided in Stadler v. City of Atlantic City based upon a an identical analysis he proposes to perform in the case currently before this court, a case that occurred within weeks of the Stadler incident if not days given the fact that a confidentiality order existed in relation to the Internal Affairs files produced similar to a confidentiality order that exist in the current case before this court. In this respect, Dr. Shane has essentially already invented the wheel and does not need to reinvent it with respect to his statistical analysis and quantitative analysis performed in the opinions provided in Stadler in his expert reports in his testimony in Stadler portions which are attached hereto.

For all the aforementioned reasons it is respectfully requested that the court compel the Defendant City of Atlantic City to produce 10 years of Internal Affairs files 2005 to 2015 for the entire Police Department and Internal Affairs files relating to complaints for use of excessive force, assault, unlawful arrest and false arrest for the same time frame.  Plaintiff also reserves the right to make a fee application for the filing of this motion pursuant to F.R. Civ. P. 37

Respectfully submitted,

DAVID R. CASTELLANI, ESQUIRE

Dated:

**CASTELLANI LAW FIRM, LLC**
David R. Castellani, Esquire - ID #: 023691991
450 Tilton Road, Suite 245
Northfield, New Jersey 08225
(609) 641-2288
Attorneys for Plaintiff(s)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| **NICHOLAS J. ZAMPETIS** | : |
| | : |
| | : |
| | : |
| | : **CIVIL No.: 1:15-cv-01231-NLH-AMD** |
| **v.** | : |
| | : |
| **CITY OF ATLANTIC CITY, POLICE** | : |
| **OFFICER IVAN LOPEZ, POLICE** | : |
| **OFFICER ANTHONY ALOSI, JR.** | : |
| **POLICE OFFICER MIKE AUBLE, and** | :   **ORDER** |
| **JOHN DOE ATLANTIC CITY POLICE** | : |
| **OFFICERS 1-5, INDIVIDUALLY AND** | : |
| **IN THEIR OFFICIAL CAPACITY,** | : |
| **JOHN DOES 1-5** | : |
| | : |
| | : |

   ***THIS MATTER*** having been opened to the Court by David R. Castellani, Esquire of Castellani

Law Firm, LLC, attorney for Plaintiffs, and Tracy Riley, Esquire and Barbara Johnson Stokes, Esquire

having appeared on behalf of the Defendants, and the Court having considered the matter and good cause

appearing;

   ***IT IS*** on this _____ day of _____, 2018, ***ORDERED*** as follows:

   1.)  Defendants must provide the Plaintiff with any and all IA files of all officers I the ACPD

from 2005 to 2015 with _____ days of the date of this order.

(  ) Answering Papers
(  ) Reply papers

          _____
           Magistrate Judge Ann Marie Donio

**CASTELLANI LAW FIRM, LLC**
David R. Castellani, Esquire - ID #: 023691991
450 Tilton Road, Suite 245
Northfield, New Jersey 08225
(609) 641-2288
Attorneys for Plaintiff(s)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| **NICHOLAS J. ZAMPETIS** : | |
| : | |
| : | |
| : | **CIVIL No.: 1:15-cv-01231-NLH-AMD** |
| **v.** : | |
| : | |
| **CITY OF ATLANTIC CITY, POLICE** : | |
| **OFFICER IVAN LOPEZ, POLICE** : | |
| **OFFICER ANTHONY ALOSI, JR.** : | |
| **POLICE OFFICER MIKE AUBLE, and** : | **CERTIFICATION OF SERVICE** |
| **JOHN DOE ATLANTIC CITY POLICE** : | |
| **OFFICERS 1-5, INDIVIDUALLY AND** : | |
| **IN THEIR OFFICIAL CAPACITY,** : | |
| **JOHN DOES 1-5** : | |
| : | |
| : | |
| : | |

I, David R. Castellani, Esquire, hereby certify that a copy of the within Motion Compelling Documents and Brief in Support of Motion has been electronically filed and has been electronically served upon:

    Tracy L. Riley, Esquire
    Rachel Conte, Esquire
    **LAW OFFICES OF RILEY & RILEY**
    100 High Street, Suite 302
    Mount Holly, NJ 08060

    Todd Gelfand, Esquire
    **BARKER, GELFAND & JAMES**
    Linwood Greene – Suite 12
    210 New Road
    Linwood, New Jersey 08221

I hereby certify under penalty of perjury under the laws of the United States of America and the State of New Jersey that the above Certification of Service is true and correct.  I recognize that if any of the foregoing is willfully false, I am subject to punishment.

*s/ David R. Castellani*

Date:  April 6, 2016        _____

DAVID R. CASTELLAN

# EXHIBIT "A"

# CASTELLANI LAW FIRM, LLC
### 450 Tilton Road, Suite 245
### Northfield, New Jersey 08225

DAVID R. CASTELLANI
*Certified by the Supreme Court*
*of New Jersey as a Civil Trial Attorney*

Phone: (609) 641-2288
Fax: (609) 641-2299
*david@castellanilaw.com*
Tax I.D. No.: 20-3743893

August 30, 2017

A. Michael Barker, Esquire
**BARKER, GELFAND & JAMES**
210 New Road
Linwood, New Jersey 08221

      Re:    <u>Zampetis v. City of Atlantic City, et al</u>
              Civil Action No.: 1:15-cv-01231

Dear Mr. Barker:

      Enclosed please find Plaintiff's Supplemental Notice to Produce Directed to Defendant City of Atlantic City. Kindly respond within the time prescribed by the Court.

      If you have any questions, or need for additional information, please do not hesitate to contact me.

Very truly yours,
CASTELLANI LAW FIRM, LLC

/s/ David R. Castellani

DAVID R. CASTELLANI

/kw
cc:    Tracy L. Riley, Esquire
       Nicholas J. Zampetis

**CASTELLANI LAW FIRM, LLC**
David R. Castellani, Esquire – ID #: 023691991
450 Tilton Road, Suite 245
Northfield, New Jersey 08225
(609) 641-2288
Attorneys for Plaintiff(s)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| NICHOLAS J. ZAMPETIS | : |
| | : |
| | : |
| | : **CIVIL No.: 1:15-cv-01231-NLH-AMD** |
| **v.** | : |
| | : |
| CITY OF ATLANTIC CITY, POLICE | : |
| OFFICER IVAN LOPEZ, POLICE | : |
| OFFICER ANTHONY ALOSI, JR. | : |
| POLICE OFFICER MIKE AUBLE, and | : |
| JOHN DOE ATLANTIC CITY POLICE | : |
| OFFICERS 1-5, INDIVIDUALLY AND | : |
| IN THEIR OFFICIAL CAPACITY, | : |
| JOHN DOES 1-5 | : |
| | : |
| | : |

## PLAINTIFF'S SUPPLEMENTAL NOTICE TO PRODUCE DIRECTED TO
## DEFENDANT, CITY OF ATLANTIC CITY

TO:   A. Michael Barker, Esquire
      **BARKER, GELFAND & JAMES**
      210 New Road
      Linwood, New Jersey 08221

In accordance with R. 4:10-2 et seq. and R. 4:18-1 specifically, Plaintiff demands that the

Defendants provide copies of all discoverable materials and information within thirty (30) days

after the service of this request.

If the Defendants believe something is not discoverable, please identify the item or information and state why it is not discoverable. If the item cannot be copied, please state what it is so a mutually convenient date and time can be agreed upon for inspection or reproduction of the item.

The following information and materials are requested:

1.) Copies of all discovery including deposition transcripts and interrogatory answers in the case of Harrison v City of Atlantic City, et al.; Adams v. City of Atlantic City and Castellani v. City of Atlantic City.

2.) Copy of the New Jersey Attorney General's OLEPS report relating to the incidences of a use of force within the Atlantic City Police Department.

3.) Copy of the complete Internal Affairs file relating to the arrest of Plaintiff by Defendants.

4.) Copy of the complete Municipal Court transcript relating to the trial in State v. Zampetis which was tried in the Atlantic City Municipal Court and involved the individual Defendant Officers.

5.) Copies of any photographs taken of the Plaintiff by any of the Defendants.

6.) Copies of any and all emails between any of the Defendants and or any members of the Atlantic City Police Department relating to their arrest and charging of the Plaintiff.

7.) Copies of any and all TAC audio transmissions relating to Plaintiff and the arrest made of Plaintiff which is the subject matter of Plaintiff's complaint.

8.) Copies of any and all Dash Cam video surveillance of the arrest of Plaintiff or the immediate aftermath of the arrest of Plaintiff including the transportation of Plaintiff to the police station and hospital

9.) Copy of any and all video footage of the Plaintiff after his arrest by the defendants in the Atlantic City Police Station.

10.) Copies of any and all policies and procedures in place at the Atlantic City Police Department relating to Use of Force and Baton/Expandable Baton.

11.) Copies of any and all documents including emails relating to surveillance video coverage of the incident involving Plaintiff and the Defendants from Tropicana Hotel & Casino.

12.)    Copies of any and all documents relating to triggering or activation of the Early Warning System by any of the Defendant Police Officers in their employment history with the Atlantic City Police Department.

13.)    Copies of all documents relating to an Early Warning System Policies and Procedures in place within the Atlantic City Police Department in 2012 and 2013.

14.)    Copies of any and all documents from the Atlantic City Police Department or Atlantic County Prosecutor calculating the incidences of use of force by each police officer in the police force for the years 2012, 2013, 2014, 2015, 2016, 2017.

15.)    All MAR and SPAR reports generated with the ACPD in the years 2013, 2014, 2015, 2016 and 2017.

16.)    Internal Affairs' Complaints filed against all ACPD officers for Excessive Use of Force, Assault, False Arrest from 2005 to present.

17.)    All Internal Affairs' Complaints filed with the ACPD between 2005 and present.

18.)    Copies of any documents relating to text messages or any other form of electronic communication between the named Defendant Officers.

19.)    Copies of any and all body worn camera video footage of the arrest of the Plaintiff or any aftermath of the arrest including police station footage.

CASTELLANI LAW FIRM, LLC

David R. Castellani, Esquire

Date: 8/30/17

# CASTELLANI LAW FIRM, LLC
### 450 Tilton Road, Suite 245
### Northfield, New Jersey 08225

DAVID R. CASTELLANI
*Certified by the Supreme Court*
*of New Jersey as a Civil Trial Attorney*

Phone: (609) 641-2288
Fax: (609) 641-2299
*david@castellanilaw.com*
Tax I.D. No.: 20-3743893

January 29, 2018

Todd Gelfand, Esquire
**BARKER, GELFAND & JAMES**
210 New Road
Linwood, New Jersey 08221

     Re:    <u>Zampetis v. City of Atlantic City, et al</u>
             Civil Action No.: 1:15-cv-01231

Dear Mr. Gelfand:

      I previously sent you an email on January 15, 2018, requesting more specific answers to a Notice to Produce documents propounded upon the City of Atlantic City in relation to my letter of November 20, 2017. To date I have not received the same.

      In addition to the eight (8) requests for more specific documents set forth in my November 20, 2017 letter to you, I also requested that the City of Atlantic City produce all Internal Affairs files for all City of Atlantic City police officers from 2005 to the present as relevant to the <u>Monell</u> claims a set forth in the plaintiff's complaint.

      As you are aware, the City has been ordered to produce these files in numerous similar cases including <u>Constantino v. City of Atlantic City</u>. In <u>Constantino</u>, Judge Schneider held that "although it should be obvious, in order to prove her <u>Monell</u> allegations, it is essential that plaintiff be permitted to review Atlantic City's IA files. There can be no question of the relevancy of the IA files to the allegations of the complaint particularly where the complaint alleges inadequate supervision and training under §1983. Indeed, the IA files are vital to plaintiff's <u>Monell</u> allegations. As the court noted in <u>Groark I</u>, "the requested IA files are fair game for discovery because they are directly relevant to plaintiff's claims that Atlantic City's IA process is a sham and Atlantic City failed to properly train its officers." This explains the unremarkable fact that production of IA files is routinely ordered in §1983 cases." <u>Constantino</u> supra at 321 – 322.

Given the holding in <u>Constantino</u> and other similar cases filed against the City of Atlantic City, I am a making one last attempt to resolve this discovery issue without resort to motion practice. Please contact me to discuss the same.

Very truly yours,

CASTELLANI LAW FIRM, LLC

DAVID R. CASTELLANI

cc:     Tracy L. Riley, Esquire
        Nicholas J. Zampetis

# CASTELLANI LAW FIRM, LLC
### 450 Tilton Road, Suite 245
### Northfield, New Jersey 08225

DAVID R. CASTELLANI
*Certified by the Supreme Court*
*of New Jersey as a Civil Trial Attorney*

Phone: (609) 641-2288
Fax: (609) 641-2299
*david@castellanilaw.com*
Tax I.D. No.: 20-3743893

February 5, 2018

The Honorable Ann Marie Donio
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
Mitchell H. Cohen U.S. Courthouse
1 John F. Gerry Plaza, 4th & Cooper Streets
Camden, New Jersey 08101
[Via Fax (856-757-5296)]

> Re:   Zampetis v. City of Atlantic City, et al
>       NJ District Court Case #: 1:15-cv-01231-NJH-AMD

Dear Judge Donio:

I am writing to you pursuant to Local Civil Rule 37.1 (a) (1) as a discovery dispute has

arisen between the plaintiff and the defendants in relation to certain documents plaintiff has

requested by way of a Notice to Produce and the defendant City of Atlantic City has refused to

provide.

I have forwarded a letter and the email to Mr. Gelfand, counsel for the defendant City of

Atlantic City requesting that his client provide plaintiff with copies of all internal affairs files

from 2005 to the present for all Atlantic City police officers as relevant to many of the Monell

claims the plaintiff has set forth in his complaint.

The plaintiff's complaint against the defendants alleges claims for excessive force and

malicious prosecution and includes Monell claims for failure to supervise and train as well as

claims concerning the internal affairs process within the Atlantic City Police Department

including the ineffectiveness and lack of an Early Warning System and allegations that the entire Internal Affairs process with respect to a citizen's complaint is a sham.

I had pointed out to Mr. Gelfand in the letter dated January 29, 2018 as well as in the more recent email that judges in the District have previously ordered production of these very same internal affairs files which plaintiff is seeking in this case in similar excessive force, malicious prosecution cases. I even cited Judge Schneider's opinion in <u>Constantino v. The City of Atlantic City</u> as well.

I've also personally conferred with Mr. Gelfand on January 16, 2018, at a deposition, concerning the production of these internal affairs files and he indicated to me that I should file a motion to compel the same.

I respectfully request that Your Honor schedule a conference to discuss this discovery dispute in accordance with the Federal Rules of Civil Procedure 37.1 (a) (1).

Further, by copy of this correspondence, I am placing counsel on notice, that in the event this discovery dispute cannot be resolved and that plaintiff must resort to motion practice, that I will be seeking attorney's fees for the necessity of filing such a motion pursuant to Rule 37.1. I look forward to discussing this issue with Your Honor in a greater detail.

Respectfully submitted,
CASTELLANI LAW FIRM, LLC

/s/ David R. Castellani

DAVID R. CASTELLANI
/k
Cc:     Todd Gelfand, Esquire
        Rachel Conte, Esquire
        Nicholas Zampetis

# EXHIBIT "B"

——— SHANE - DIRECT - BONJEAN ———

1  and to offer an opinion here today to the ladies and gentlemen

2  of the jury?

3  A.  Yes, I did.

4  Q.  And what data did you have on which you based your

5  analysis and prepare your reports?

6  A.  Well, there were two separate analyses that I conducted,

7  so I relied on a couple different things.

8      The first thing I relied on was a random sample of 33

9  Internal Affairs cases, that was for a qualitative analysis

10  looking at the process by which Atlantic City Police

11  Department conducts its Internal Affairs program, and the

12  Internal Affairs files that were submitted as part of

13  discovery that came from the Atlantic City Police Department.

14  Q.  Okay.  And, again, we're focussing on Report Number 1,

15  right?

16  A.  Yes.

17  Q.  Okay.  Did you also have the complete Internal Affairs

18  files of the defendant officers as well?

19  A.  Yes, I did.

20  Q.  Okay.  So I'm going to -- I'm not going to ask about that

21  right this second, but we're ongoing to focus on the Report 1

22  which deals with the Internal Affairs function overall.  Okay?

23  A.  Yes.

24  Q.  What -- and if you could refer to Page 18 of your report,

25  maybe you don't need to, but what standards or policies did

1  Affairs function of the Atlantic City Police Department?

2  A.   Yes, I did.

3  Q.   And I think you mentioned at least one part of it.  Was

4  it a one-part, two-part plan?

01:03  5  A.   Two parts.

6  Q.   What was the first part?

7  A.   The first part was to select a random sample of Internal

8  Affairs files.  That was a qualitative analysis that I

9  conducted.  I wanted to understand the quality of the

01:04  10  investigations that were being conducted.

11  Q.   And what about the second part, what was the second part

12  of your examination or of your plan for examining the Internal

13  Affairs function?

14  A.   That was a data analysis empirical review of the Internal

01:04  15  Affairs files that were presented to me.

16  Q.   Okay.  And would you say that sort of was statistical in

17  nature?

18  A.   Yeah, sure, yes.

19  Q.   Okay.  So now let's talk about part one.

01:04  20  A.   Okay.

21  Q.   Tell the ladies and gentlemen of the jury what you did as

22  part of this qualitative or process evaluation for examining

23  the Internal Affairs function.

24  A.   So the first thing I did is I identified the years in

01:04  25  question and we had the years laid out, and I got the data

SHANE – DIRECT – BONJEAN

1   from the attorney, and I conducted what is known as a

2   stratified random sample.  That's not hard to understand.

3   Stratified means that the years were parsed out, and then from

4   each of those years, I selected a random sample of cases.  And

5   I selected a random sample to ensure the -- that bias was

6   reduced as much as possible.  And that's in fairness to the

7   Atlantic City Police Department; that's in fairness to the

8   plaintiff.  Because I want to be able to limit any -- any

9   systematic -- what's called systematic bias.  I don't want to

10  just pick this case and this case, and suddenly I have a

11  series of cases that are all good or all bad, and that's not

12  the way to conduct a process evaluation.

13  Q.   Okay.  And why 33 cases?  How did you come up with that

14  number?

15  A.   There's an empirical statistical process called

16  saturation.  And what happens during saturation, that's the

17  point at which you develop no further information, so there is

18  no sense in looking at more cases.  And social scientists have

19  determined that saturation occurs at relatively low levels.

20  In many cases, it's as low as six cases.  You'd only have to

21  look at six cases to establish the patterns that emerge.  I

22  stuck with some of the other science that says, generally,

23  between 10 and 12 cases is sufficient for saturation.  But in

24  keeping with a larger representative sample, I felt it

25  important to the Atlantic City Police Department and to the

SHANE - DIRECT - BONJEAN

1   plaintiff to draw a larger sample, so I selected about three

2   times as many, and I chose three cases per year for 11 years.

3   Q.   Okay.

4   A.   Which is 33.

01:06   5   Q.   Well, was it 2009 to 2013 you were looking at for that

6   process part?

7   A.   Let me check.  I believe the answer is yes but let me

8   just double-check.

9   Q.   You can look at the front page of your --

01:06   10   A.   For the process evaluation --

11   Q.   Oh, no --

12   A.   No.  It was 2004 to 2014.

13   Q.   My apologies.

14   A.   That's the 11-year span.

01:07   15   Q.   Okay.  And you didn't just say, oh, 33 sounds good to me,

16   right?

17   A.   No.

18   Q.   Was there actual statistical principles that guided your

19   choice of 33?

01:07   20   A.   I relied on the literature and the science behind

21   saturation.

22   Q.   Okay.  And if we accept that saturation is a valid

23   principle --

24   A.   It's been validated.

01:07   25   Q.   It's been validated.  Is this a -- is the saturation

SHANE - DIRECT - BONJEAN

1    principle something that is readily accepted in the community

2    of social science?

3    A.   Especially in the qualitative research field, yes.

4    Q.   Okay.  And so, correct me if I'm wrong, under this

01:07    5    principle, whether you pick 33 or 133, the trend -- what you

6    see should be consistent.  Is that right?

7    A.   That's correct.

8    Q.   Okay.

9    A.   The reason you don't pick the 133 really is a matter of

01:08    10   efficiency.

11   Q.   It's overkill?

12   A.   It is, yes.

13   Q.   And you talked about trying to avoid systematic bias.  Do

14   you remember that?

01:08    15   A.   Yes.

16   Q.   If I had come to you and said, Dr. Shane, I have 33

17   cases, I want you to just look at these 33, these are

18   supergood ones, would that have produced what you would

19   consider a reliable reflection of the Atlantic City Police

01:08    20   Department?

21   A.   Absolutely not, no.

22   Q.   And did I do that?

23   A.   No, you didn't do that.

24   Q.   In fact, did I -- were you asked to look and examine

01:08    25   Steven Stadler's Internal Affairs file specifically?

───SHANE - DIRECT - BONJEAN───

1    A.    You did not ask me to do that.  I did it, but you did not

2    ask me to do it.

3    Q.    And the 33 cases that you chose, did I have anything to

4    do with choosing those cases?

01:09    5    A.    No.

6    Q.    How did you actually do it, by the way, so the ladies and

7    gentlemen of the jury can understand?

8    A.    Well, I used a free internet-based software, what's

9    called a randomizer.  It just randomizes the numbers.  And as

01:09    10    the random numbers are spit out, I take them in sequential

11    order.

12        So, let me give you an example.  So, for 2004, the

13    first number that appeared was 41.  The second number to

14    appear was 152.  The third number to appear was 146.  The

01:09    15    fourth number to appear was 34.  So, knowing the -- the list

16    of cases that appeared in 2004 that Atlantic City proffered, I

17    went down the list and said, okay, I need Case Number 41.

18    Case Number 152, there was no -- there wasn't one.  146, I

19    didn't have one.  34, there was one, so I got that one.

01:10    20    Q.    Okay.  So, did you actually look at the substance of any

21    of those Internal Affairs files that you ultimately reviewed

22    prior to choosing to make them part of the 33?

23    A.    What do you mean exactly?

24    Q.    Yeah.  Not a great question.  It happens sometimes.

01:10    25        Let me -- so when you chose these 33 -- or when this

*United States District Court*
*Camden, New Jersey*

————— SHANE - DIRECT - BONJEAN —————

1    randomizer chose these 33 random cases, you didn't actually

2    flip through the cases themselves and say, oh, this is one

3    that, you know, I definitely want to look at or anything or

4    was it basically, these are the numbers, this is the one I

01:10    5    got?

6    A.    No, the numbers drive the process.

7    Q.    Okay.  And this was irrespective of the type of

8    complaints as well, right?

9    A.    It has nothing to do with that.

01:10    10    Q.    Okay.

11    A.    It doesn't deal with the complaint, the officer, the

12    supervisor, none of that.  It's the number that drives the

13    case.  So if Case Number 41 is the one that's selected,

14    whatever that case happens to be, that's the case that gets

01:11    15    examined.

16    Q.    And was it your expert opinion that this was the most

17    reliable way to make conclusions about the Atlantic City

18    Police Department's Internal Affairs function overall?

19    A.    Yes.

01:11    20    Q.    Okay.  Now, you've explained to us how you got these 33

21    cases.  Once you received those 33 cases and pulled those

22    Internal Affairs investigations, how did you examine them or

23    for what did you examine them?

24    A.    Well, I measured the -- what was done in the internal

01:11    25    investigation against the accepted practices.

SHANE - DIRECT - BONJEAN

1    Q.    Okay.  But what were you trying to determine?

2    A.    I was trying to determine whether or not the process,

3    what is known as the Internal Affairs program, was conducted

4    in accordance with accepted standards.

5    Q.    Okay.  And what standard are we talking about?

6    A.    The Attorney General's Guidelines, the accepted practices

7    for criminal investigations, the U.S. Department of Justice

8    Internal Affairs practices.

9    Q.    Okay.  Well, let's talk about the New Jersey guidelines.

10   Is there a guideline, an actual mandatory guideline, about

11   what has to happen with an Internal Affairs investigation?

12   A.    The Attorney General's policy.

13   Q.    Okay.  No, is -- within the Attorney General's policy, is

14   there a specific guideline about the investigation itself,

15   what has to -- what has to occur in the investigation?

16   A.    The Attorney General's policy doesn't lay out the

17   procedural aspects of how you're going to conduct it.

18   Q.    You're getting ahead of me.

19   A.    Okay.

20   Q.    Does the Attorney General Guideline require to be

21   objective and thorough?

22   A.    Yes, it does.

23   Q.    Okay.  That's all I wanted.

24   A.    Okay.

25   Q.    So, I believe ---

SHANE - DIRECT - BONJEAN

1   2009 and 2013?

2   A.   Yes, you did.

3   Q.   For the statistical part, right?

4   A.   Yes.

02:36   5   Q.   And so we're looking at this period of time.  How many

6   Internal Affairs investigations did you essentially count from

7   2009 to 2013?

8   A.   778.

9   Q.   And how many complaints were contained within those

02:37   10   investigations?

11   A.   1,999.

12   Q.   All right.  What -- okay.  So, there are complaints that

13   are called I think other rule violations?

14   A.   Other rule violations, yes.

02:37   15   Q.   Can you tell the ladies and gentlemen of the jury what an

16   other rule violation is?

17   A.   Oftentimes, a police department has a catchall category,

18   some other rule violation that is not necessarily defined by

19   the organization, and what I was looking at here was putting,

02:38   20   putting a -- categorizing things to, in the interest of

21   amalgamating what I was looking at, I categorized other rule

22   violations as things like neglect of duty, standard of

23   conduct, improper procedure, those kind of things, as measured

24   against the other complaints that were there.

02:38   25   Q.   Now, would you say that this other rule category are

SHANE - DIRECT - BONJEAN

1  things that do not have the potential to be criminal?

2  A.   Probably not.

3  Q.   Right.

4  A.   Probably not.  And mostly administrative.

02:38  5  Q.   Okay.  So, for instance, if an officer failed to, I don't

6  know, follow some procedure, filed the inventory or something,

7  might that be an other rule violation?

8  A.   That's correct, yes.

9  Q.   So, putting aside these other rule violations that are

02:38  10  almost invariably administrative, what was the most common in

11  this period of time, the most frequent Internal Affairs

12  complaint that was made against the Atlantic City Police

13  Department between 2009 and 2013?

14  A.   Excessive force.

02:39  15  Q.   And how many excessive force complaints did you calculate

16  between this time period?

17  A.   456, which amounted to 22.8 percent of the total

18  complaints.

19  Q.   By the way, do you even know whether that's an accurate

02:39  20  number of excessive force complaints?

21  A.   No, I don't.

22  Q.   But that was based on data that was provided by the

23  Atlantic City Police Department, right?

24  A.   Yes.

02:39  25  Q.   All right.  And I'm sorry, did you say what percentage of

SHANE - DIRECT - BONJEAN

1    complaints were sustained?

2    A.   I have it written in here.  Can I find the table?

3    Q.   Yes.

4    A.   Give me a moment.

02:43    5    Q.   Page 50, I think.  No, that's -- page 51.

6    A.   One was sustained.  That appears in table 13 on page 51.

7    One complaint was sustained, 455 were not sustained.

8    Q.   Okay.  Now, looking at the bottom of page 50, what is the

9    national rate of sustained complaints for an agency comparable

02:44    10   in size to the Atlantic City Police Department?

11              MS. RILEY:  Objection, relevance.

12              THE COURT:  Overruled.

13              THE WITNESS:  A sustained rate around the nation is

14   about 12 percent.  So, the Bureau of Justice Assistance, who

02:44    15   is a federal arm under the U.S. Department of Justice,

16   categorizes police departments, and one of the categories is

17   250 to 499 officers.  So, during that period of time Atlantic

18   City had an average of about 361 officers.  So, they fall into

19   that category, and the national rate was about 12 percent.

02:44    20   BY MS. BONJEAN:

21   Q.   So, the national rate was about 12 percent, right?  And

22   were you able to -- were you able to determine what the

23   percentage, the sustained rate for Atlantic City was?

24   A.   .219 percent.

02:45    25   Q.   .219 percent?

SHANE - DIRECT - BONJEAN

1   of courts, and agency policy, which is developed by the agency

2   in accordance with statutory and procedural law.

3   Q.   Got it.  All right.  Now, I'd like to now draw your

4   attention, if I could, I think we've covered for the most part

02:35   5   some of the qualitative or themes that you saw that led you to

6   believe that the Internal Affairs function was not thorough

7   and objective, right?

8   A.   Yes.

9   Q.   On the qualitative side, right?

02:35   10   A.   Yes.

11   Q.   Were you able to look at some other data that helped to

12   either reinforce your conclusions?

13   A.   Yes, the Atlantic City Police Department's data on

14   Internal Affairs.

02:36   15   Q.   So, I'm going to draw your attention to page 47, and did

16   you find a pattern of complaints against Atlantic City Police

17   officers during a period of time of 2009 to 2013?

18   A.   Yes.

19   Q.   Okay.  Now, is it fair, Dr. Shane, that you had access to

02:36   20   Internal Affairs investigations that was broader than 2009 to

21   2013?

22   A.   Yes, I think so, yes, '04.

23   Q.   Right.

24   A.   Yeah, from '04.

02:36   25   Q.   And did I ask you to look at this time period between

———— SHANE — DIRECT — BONJEAN ————

1    all types of complaints excessive force made up?

2    A.    22.8 percent.

3    Q.    So, 22.8 percent of all the complaints possible that

4    could be made against the Atlantic City Police Department were

02:40    5    excessive force complaints, right?

6           MS. RILEY:  Objection, leading.

7           MS. BONJEAN:  Well, I'll withdraw it.

8    BY MS. BONJEAN:

9    Q.    Go ahead, explain the 22.8 percent.

02:40    10    A.    That's 22.8 percent of what I examined.

11    Q.    Right.

12    A.    Not of the entire universe of things that could

13    potentially come up against an officer.

14    Q.    Correct.  Okay.  Fine.  Fair enough.

02:40    15           All right.  Did you include complaints that were also

16    characterized as assault under this excessive force?

17    A.    No.

18    Q.    Okay.  So, is assault a separate category on top of

19    excessive force?

02:41    20    A.    Yes.  And that would include sexual assault as the way I

21    have it here, yes.

22    Q.    Okay.  So, we're going to focus on the excessive force,

23    if you might with me, hold on with me for a second.  Okay?

24    Now, I think the jury already knows this, but just quickly, if

02:41    25    a complaint is investigated and it's found to have happened

SHANE -- DIRECT -- BONJEAN

1    and it was a violation, what do they characterize that as?

2    A.   What's the disposition?

3    Q.   What's the disposition.

4    A.   Just to make sure I'm clear, if an allegation is made and

02:42    5    the charge --

6    Q.   Strike that.  What are the possible dispositions?

7    A.   Sustained, not sustained, exonerated, unfounded.

8    Q.   Okay.  And which one of those --

9    A.   And by the way, excuse me, Atlantic City uses

02:42   10   administratively closed, which is where I believe a

11   complainant withdraws their complaint, they say they don't

12   want to pursue it any longer, they close it administratively.

13   That's not an accepted disposition by the Attorney General,

14   although I will say that I have seen that in other places, but

02:42   15   the accepted four from the Attorney General are sustained, not

16   sustained, exonerated and unfounded.

17   Q.   Okay.  And of those categories you identified, if an

18   investigator says yes, I believe this officer committed an act

19   of excessive force, what would be the designation it was

02:42   20   given?

21   A.   It would be sustained.

22   Q.   Okay.  So, just so we're talking with the same language,

23   if you could, of those 456 complaints for the department for

24   excessive force that you identified in this period of time

02:43   25   from 2009 to 2013, how many of those excessive force

SHANE — DIRECT — BONJEAN

1   A.   Yes.

2   Q.   Less than a quarter of a percent?

3   A.   That's correct, .22 if you wanted to round it.

4   Q.   Still less than a quarter of a percent?

02:45   5   A.   Sure is.

6   Q.   Did this data in any way influence your opinion about the

7   quality of the Internal Affairs investigations of this

8   department?

9   A.   Well, the findings in Atlantic City are clearly not

02:45   10   consistent with the national rate, and if -- when you measure

11   the two, when you look at the practices or the quality of the

12   Internal Affairs investigations and because they've got so

13   many missing pieces, I said to myself there's a strong, very

14   high probability that the outcomes may have been different,

02:46   15   which would have raised that rate had they had all the proper

16   pieces put together.

17   Q.   Thank you.  Now, by the way, did you actually have

18   opportunity to look at some other data, for instance, how many

19   excessive force complaints resulted in medical treatment for

02:46   20   those who claimed that they had been the subject of excessive

21   force?

22   A.   I did.  I drafted --

23   Q.   Page 49.

24   A.   Okay.  Thank you.  I drafted a series of tables and

02:47   25   analysis for that sort of thing.  You said --

———— SHANE — DIRECT — BONJEAN ————

1   Q.   I may be wrong about that.

2   A.   -- 49?  No.

3   Q.   Hold on.  Let me get to it.  Page 58.

4   A.   58?  Okay.  Your question again, please?

02:47   5   Q.   Yes.  Of those -- we talked about 456 excessive force

6   complaints.  What percentage of those did the complainants who

7   were alleging excessive force have to receive medical

8   treatment?

9   A.   71.9 percent, so essentially 72 percent.

02:47   10   Q.   All right.  The fact that so many -- well, I won't say so

11   many, but the fact that nearly 72 percent of complainants

12   actually needed medical treatment, what does that tell you

13   about the credibility of these excessive force complaints

14   overall?

02:48   15        MS. RILEY:  Objection.  Beyond the expert's scope,

16   Judge.

17        THE COURT:  Let's go to sidebar on this.  I need to

18   learn more about this.

19        (Sidebar)

02:49   20        THE COURT:  Where is this going?

21        MS. BONJEAN:  Just that the fact that people are

22   actually getting medical attention shows that these are not

23   frivolous complaints.  They may not all have been sustained or

24   not sustained, some of them should never been filed, I don't

02:49   25   know, because there never have been any investigations done,

SHANE - DIRECT - BONJEAN

1    but the point is the other side says all these complainants

2    are just lying, lying, lying, all of them, and the fact that

3    there's actually corroborating medical evidence undermines

4    that.

02:49    5         THE COURT:  How does medical evidence corroborate use

6    of excessive force?  There are no distinctions as to how these

7    people suffered the injuries.  They claim they suffered

8    injuries, right?

9         MS. BONJEAN:  Well, I think that if someone says that

02:50    10   they were punched in the eye and they didn't have a black eye,

11   that might say maybe he's not telling the truth.

12        THE COURT:  But he didn't do that kind of analysis,

13   did he?

14        MS. BONJEAN:  No, it was just data, statistical.

02:50    15   That's fine.  I'll leave it.

16        THE COURT:  Objection sustained.

17        MS. BONJEAN:  I don't have to overreach.

18        MS. RILEY:  Thank you.

19        (End of sidebar.)

02:51    20   BY MS. BONJEAN:

21   Q.   Dr. Shane, did you do some analysis about comparing

22   complaints that initiated from inside the department versus

23   outside the department?

24   A.   I did, yes.

02:51    25   Q.   Can we call those complaints -- what would you call those

SHANE - DIRECT - BONJEAN

1    complaints that initiated from inside the department?

2    A.    Internal complaints.

3    Q.    And what would you call those complaints that were

4    initiated from outside the department?

02:51    5    A.    External complaints.

6    Q.    And can you tell the ladies and gentlemen of the jury

7    what you mean by complaints that initiated from inside the

8    department?

9    A.    So, within the organization, naturally there's a rule

02:51    10    book and there's policies, and if a police officer is observed

11    violating one of those policies or something comes to the

12    attention of the command staff or supervisor, they are

13    permitted to initiate an internal investigation coming from

14    within the organization, something that another police

02:51    15    supervisor has observed.

16    Q.    And would it be fair to say that most complaints that

17    come from inside the department are either other police

18    officers or civilian personnel who work for the department?

19    A.    It's either going to come from another police officer, a

02:52    20    civilian inside the organization, or a supervisor inside the

21    organization.

22    Q.    So, either sworn or civilian working for the department,

23    correct?

24    A.    Correct.

02:52    25    Q.    Now, external complaints typically come from where?

SHANE — DIRECT — BONJEAN

1  A.   Citizens.

2  Q.   Civilian citizens?

3  A.   Yes.

4  Q.   All right.  Now, did you have an opportunity to look at

02:52     5  the complaints, all -- and I'm not just talking about

6  excessive force complaints right now.  Okay?  I'm talking

7  about the Internal Affairs complaints for this time period

8  we've discussed, I think 2009 to 2013.  Did you have an

9  opportunity to figure out how many of those complaints were

02:52    10  coming from inside the department versus outside the

11  department?

12  A.   I did some analysis on that, yes.

13  Q.   All right.  And do you have a table that I will direct

14  you to?  52?  Thank you.  I passed by it.

02:53    15  A.   Are you referring to table 14?

16  Q.   51?

17  A.   Page 51?

18  Q.   51, I guess.  Oh, no.  51?  Okay.

19  A.   Table 14, page 51.

02:53    20  Q.   Yes.  I got it.  Thank you.

21       Okay.  Of the Internal Affairs complaints that you

22  reviewed, did most come from outside the department or inside

23  the department?

24  A.   Most of the complaints overall, whether or not they were

02:54    25  sustained, came from outside the department.

—————SHANE - DIRECT - BONJEAN—————

1    Q.   Okay.  And we're putting dispositions aside for a second.

2    What percentage of Internal Affairs complaints came from

3    external sources, people, really civilians or citizens?

4    A.   83.6 percent, so 84 percent.

02:54  5    Q.   And how many of the Internal Affairs complaints were

6    initiated by individuals working within the department?

7    A.   16 percent.

8    Q.   All right.  Now, I want to ask you first about of those

9    Internal Affairs complaints that were initiated from an

02:54  10   external source, outside the department, how many were

11   sustained?  And again, we're talking about not just excessive

12   force, but any type of, any type of complaint that could come

13   in.

14   A.   Yes, 51.

02:55  15   Q.   Outside?

16   A.   That were sustained?

17   Q.   Yes.

18   A.   Excuse me.  Yeah, okay, so external complaints that were

19   sustained, 51.

02:55  20   Q.   That's a raw number.  That's not a percentage, right?

21   A.   That's the raw number.  You said how many.

22   Q.   Oh, my apologies.  Okay.  What percentage?

23   A.   Oh, 2.6 percent.

24   Q.   Okay.  So, 2.6 percent of Internal Affairs complaints

02:55  25   overall, not just excessive force, that were initiated by

SHANE — DIRECT — BONJEAN

1   civilians or external sources were sustained; is that right?

2   A.   That's right.

3   Q.   Now, looking at those Internal Affairs complaints that

4   were initiated from inside the department, either by other law

02:55   5   enforcement or personnel working, what was the sustained rate

6   for those Internal Affairs complaints?

7   A.   10 percent.

8   Q.   10 percent.  Is there -- do you have an opinion about the

9   statistical difference between the sustained rate for those

02:56   10   coming from outside the department versus those coming from

11   inside the department?

12   A.   Well, the sustained rate is almost four times as high

13   from within the organization than it is -- when a complaint is

14   generated from within the organization compared to outside the

02:56   15   organization.

16   Q.   And what is the significance of that statistical

17   differential, if you could?

18   A.   Well, a finding like this is for police management to

19   pause and to take a pause to figure out what is it about

02:56   20   external complaints that are not being sustained.  Is it the

21   lack of evidence, is it a false allegation, is it a poor

22   investigation?  Conversely, what is it about investigations

23   that are being generated internally that have such a high

24   sustained rate or such a higher sustained rate?  Is something

02:57   25   happening within the organization?  Is there a bias in favor

SHANE — DIRECT — BONJEAN

1    of the officers or compared -- or excuse me, in favor of the

2    supervisors or the person from within the organization

3    compared to a bias against someone who is outside the

4    organization?  You can't tell from the data alone, but that's

02:57    5    the management practice and the supervisory practice that

6    needs to play itself out.

7    Q.    Well, did you also look at another datapoint that helps

8    maybe flesh this out a little further?

9    A.    Yes.

02:57    10    Q.    Looking at table 15, you've identified that one important

11    feature of a thorough and objective investigation is actually

12    formally interviewing an officer, right?

13    A.    Yes.

14    Q.    How often did that happen in external complaints, meaning

02:57    15    when a civilian made the complaint, what percentage?  Just

16    give us a percentage.

17    A.    Whether the officer was formally interviewed based on an

18    external complaint happened 113 times for 5.7 percent of the

19    cases.

02:58    20    Q.    Okay.  So, in 5.7 percent of the cases, the officer was

21    formally interviewed when you're looking at it from those

22    cases that were initiated externally, right?

23    A.    That's correct.

24    Q.    How often did they interview, and they, I mean the

02:58    25    Internal Affairs investigators, interview or formally

SHANE - DIRECT - BONJEAN

1  interview a police officer when the complaint came from

2  supervisors or someone inside the department?

3  A.  I counted 148 instances, 7.4 percent.

4  Q.  7.  So, it still didn't happen very often?

02:58  5  A.  Not very frequently, no.

6  Q.  Okay.  But was it a higher -- did it happen more

7  frequently than when the complaint was initiated from outside?

8  A.  Yes.

9  Q.  All right.  And these datapoints that you looked at, did

02:59  10  they suggest any potential for bias in the investigations?

11  A.  Well, those two things taken together speak to process,

12  which is exactly what we're trying to find out, right, whether

13  or not the process is implemented properly, the Internal

14  Affairs program, and the fact that there was more formal

02:59  15  interviews conducted when complaints were generated internally

16  compared to externally suggests that they're tipping, the

17  investigator is somehow tipping in favor of complaints

18  generated inside the agency compared to outside the agency.

19  Q.  Okay.  Now, Dr. Shane, did you see anything in these

02:59  20  Internal Affairs investigations that led you to believe that

21  these Internal Affairs investigators had underwent any type of

22  formalized and routine training to conduct Internal Affairs

23  investigations?

24  A.  I didn't see any evidence in the documents that I was

03:00  25  given that the Internal Affairs investigators had training