# CASTELLANI LAW FIRM, LLC
450 Tilton Road, Suite 245
Northfield, New Jersey 08225

DAVID R. CASTELLANI
*Certified by the Supreme Court*
*of New Jersey as a Civil Trial Attorney*

Phone: (609) 641-2288
Fax: (609) 641-2299
david@castellanilaw.com
Tax I.D. No.: 20-3743893

April 9, 2018

The Honorable Ann Marie Donio, Magistrate Judge
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
Mitchell H. Cohen U.S. Courthouse
1 John F. Gerry Plaza, 4th & Cooper Streets
Camden, New Jersey 08101

      Re:    Zampetis v. City of Atlantic City, et al
              NJ District Court Case #: 1:15-cv-01231-NJH-AMD

Dear Judge Donio:

Attached are excerpts from the narrative report referred to by Judge Schneider in the Costantino opinion and designated as Exhibit C in Plaintiff's brief. The methodology and process, as well as the statistical analysis of Dr. Shane concerning Atlantic City Police Department's Internal Affairs process, are contained within these excerpts as well as the justification for his opinions. The Costantino matter occurred on July 21, 2012, Stadler occurred in February 2013, the same month as the incident involving Plaintiff Zampetis. At the risk of reinventing the wheel, the statistical and qualitative analysis performed by Dr. Shane in all probability will not change from that which he opined in Costantino and Stadler. The Monell Claims made by Zampetis in his complaint are identical with those in Costantino and Stadler. The need and relevance for the IA files in the previous years before February of 2013 is quite aptly set forth in Dr. Shane's testimony and in the excerpts of his report in Costantino, attached

hereto, and referenced in Plaintiff's brief as Exhibit C, however the page numbers are misidentified in the Certification. The pages attached are 24-28 and 48–51.

Respectfully submitted,
CASTELLANI LAW FIRM, LLC

/s/ David R. Castellani

DAVID R. CASTELLANI
/k
Cc: A. Michael Barker, Esquire
Tracy Riley, Esquire

## METHODOLOGY

**Process Evaluation**

The process evaluation consisted of analyzing content from thirty-three (33) randomly selected internal affairs investigations from the Atlantic City Police Department that were tendered during discovery. The investigations were delivered under the Court's decision on April 10, 2015. Following the generally accepted method for saturation and variability (Guest, Bunce & Johnson, 2006), I selected thirty-three investigations to ensure accurate and objective results. The concept of "saturation" is the point at which no new information or themes are observed in the data. Saturation often occurs at relatively low levels, sometimes within the first twelve cases. To ensure a better representation of investigations, I opted for a larger sample from data across each year (2004-2014).

Using free randomization software (Urbaniak, 2016), I generated eleven sets of data (2004-2014) with 224 unique numbers per set with an unsorted range from 1 to 224 to identify the ACPD internal affairs investigations (see Appendix B, table 22. The shaded investigations were selected for inclusion). Starting at Case ID#1 and proceeding sequentially, if an ACPD internal affairs investigations was available, then that investigation was selected for inclusion (e.g., ACPD case 41 was included). If investigations were outside the range (e.g., case ID #2 and #3), then those investigations were skipped until the next sequential investigation was available for inclusion (e.g., case ID# 4). In addition to skipping investigations that fell outside the numeric range, canine (K9) apprehension review investigations were skipped since they are not internal affairs investigations, they are reviews of a K9 deployment (e.g., E4, ACPD case #08-134). Three investigations from each year (2004-2014) were selected to arrive at thirty-three investigations.

Internal affairs investigations provide people with a means to redress government, a right that is embedded in the First Amendment; operationally that right translates into the internal affairs function. The primary questions are, "Did it work?" or more broadly "Did you do what you were required to do"? A process evaluation can help identify investigations that are poorly conducted (implementation failure). When an investigation is conducted as planned, the conclusions (thoroughness and objectivity) are much easier to interpret. This evaluation explores the quality of the Atlantic City Police Department's internal affairs investigations based upon accepted industry standards.

**Statistical Analysis of Atlantic City Police Internal Affairs Complaints**

The statistical analysis of the ACPD internal affairs investigations is to identify patterns, trends and relationships among phenomena. The investigations were delivered under the Court's decision of April 10, 2015 and include all investigations between 2008 and 2014. The period of analysis is 2009 to 2103. The unit of analysis is the complaint, not the case; there are 1,999 complaints and 778 individual cases. All of the tests for relationships were conducted using the standard 0.05 alpha level. Since the data is measured at the nominal level, the primary test for relationships was the chi-square rest of independence (Norusis, 2010). The codebook (Appendix D) shows the variables in the analysis and the operationalization. The analysis was conducted using IBM SPSS Statistics software, version 23.

## CONCLUSIONS AND OPINION

Based on the available evidence and data, within a reasonable degree of professional certainty, I conclude that the Atlantic City Police Department did not properly implement the internal affairs program as required by the New Jersey Attorney General's Office and did not follow accepted industry standards in effect at the time for conducting internal affairs investigations. The Atlantic City Police Department also did not follow accepted industry standards for identifying and addressing patterns and trends of complaints against police officers. My opinion is as follows:

1. **Did the Atlantic City Police Department Internal Affairs Division follow accepted practices for conducting internal investigations lodged against Atlantic City police officers?** No. The content and overall quality of internal affairs investigations is substandard. The investigations do not comport with:
    a. The national standard for conducting internal affairs investigations
    b. The New Jersey Attorney General's policy on internal affairs
    c. The CALEA standard for early warning systems
    d. The Atlantic City Police Department's policy on internal affairs
2. **Did a pattern of complaints emerge against Atlantic City police officers between 2009 and 2013?** Yes. Clear patterns of complaints emerged across various years of different types offenses.
3. **Justification for Opinion.** The justification for the opinion is set forth below.
    a. *Process Evaluation of the Atlantic City Police Department's Internal Affairs Program.* The process evaluation is undertaken to assess whether the ACPD internal affairs program is implemented according to accepted industry standards. This evaluation focuses on the program's internal investigations of ACPD personnel to determine whether the investigations are thorough and meet accepted industry standards. A process evaluation examines aspects of the program's operations that contribute to its intended goals. If the process is functioning according to industry standards, then the intended outcome is assured (the intended outcome is a thorough investigation).

    Thirty-three ACPD internal affairs investigations were randomly selected[5] from the data produced during discovery that resulted in 48 separate allegations (table 8). The leading allegation is excessive force (27.1%), followed by demeanor

---

[5] Refer to Appendix B for the randomization results


(12.5%) and standards of conduct (10.4%). Just four categories (19.0%) account for 54.2% of the allegations (indicated by the shaded rows).

Table 8
*Profile of the Process Evaluation Cases (n=48)*

| Allegations | n | % | Cumulative % | Cumulative % of Allegations |
|---|---|---|---|---|
| Excessive Force | 13 | 27.1% | 27.1% | 4.8% |
| Demeanor | 6 | 12.5% | 39.6% | 9.5% |
| Standards of Conduct | 5 | 10.4% | 50.0% | 14.3% |
| Improper Procedure | 2 | 4.2% | 54.2% | 19.0% |
| Racially Influenced Policing | 2 | 4.2% | 58.3% | 23.8% |
| Assault | 2 | 4.2% | 62.5% | 28.6% |
| Malicious Prosecution | 2 | 4.2% | 66.7% | 33.3% |
| False Arrest | 2 | 4.2% | 70.8% | 38.1% |
| Improper Entry | 2 | 4.2% | 75.0% | 42.9% |
| Neglect of Duty | 1 | 2.1% | 77.1% | 47.6% |
| Threats | 1 | 2.1% | 79.2% | 52.4% |
| Department Property and Equipment | 1 | 2.1% | 81.3% | 57.1% |
| Domestic Violence | 1 | 2.1% | 83.3% | 61.9% |
| Workplace Harassment | 1 | 2.1% | 85.4% | 66.7% |
| Manner of Dress | 1 | 2.1% | 87.5% | 71.4% |
| Conduct Toward the Public | 1 | 2.1% | 89.6% | 76.2% |
| Disparaging Remarks | 1 | 2.1% | 91.7% | 81.0% |
| Theft | 1 | 2.1% | 93.8% | 85.7% |
| Confidential Information | 1 | 2.1% | 95.8% | 90.5% |
| Obedience to Laws and Regulations | 1 | 2.1% | 97.9% | 95.2% |
| Fitness for Duty | 1 | 2.1% | 100.0% | 100.0% |
| **Total** | 48 | 100.0% | | |

In general, the investigations are superficial, they are not complete, they do not comport with accepted industry standards and they are not thorough. The most fundamental effect of superficial and incomplete internal affairs investigations is the perception of corruption as it relates to constitutional guarantees. The right to redress government is embedded in the First Amendment and operationally that right translates into the internal affairs function of a police department. The New Jersey Attorney General's policy on internal affairs recognizes this maxim with the statement "The goals of the policy are to enhance the integrity of the State's law enforcement agencies, improve the delivery of police services and assure the citizens of New Jersey that complaints of police misconduct are properly addressed" (p. 3). The State of New Jersey views internal affairs as such a critical aspect of policing that the legislature enacted specific legislation mandating that every law enforcement agency in New Jersey adopt the Attorney General's policy (*N.J.S.A.* 40A:14-181).

The general recurring themes arising from the content analysis of the investigations, which support my conclusion that the investigations are superficial and are not thorough, which ultimately compromises organizational integrity include:[6]

i. **There is no independent investigative effort from the IA investigator before a disposition is rendered.** The ACPD IA investigators do not conduct an independent investigation of the facts. The extent of a typical ACPD IA investigation is to compare the accounts of the officer against the victim/complainant's account and render a decision without any independent verification of what they were told. The IA investigator receives reports and/or a verbal account of officers' actions, then receives (most frequently) a hand-written statement from the victim/complainant, then compares both accounts and renders a decision. The IA investigator does not necessarily build a timeline or validate the information he or she is given. Moreover, basic investigative elements are frequently missing, including:

   a. Personally interviewing the officers involved separately
   b. Collecting all relevant supporting documents
   c. Documenting formal statements through electronic or video recording
   d. Obtaining formal sworn statements from witnesses and the complainant and asking probing questions during a formal statement to confirm or dispel information and provide context
   e. Canvassing the area where the incident occurred for witnesses, evidence and surveillance video
   f. Obtaining corroborating information
   g. Assisting the complainant in identifying officers that are not known at the outset of the investigation

ii. **Officers are not personally interviewed.** The ACPD IA investigators typically request and receive reports from officers under investigation in lieu of a face-to-face interview and may (or may not) only conduct a telephone interview. Face-to-face interviews that are conducted at the internal affairs office are critical because telephone interviews miss important visual communications, they are less personal

---

[6] See table 9 for the ACPD investigations and the observations from each investigation that gave rise to the themes.

Table 11
*Summary of Complaints Filed Against Atlantic City Police Officers 2009-2013 (n=1,999)*

| Variables | n | % |
|---|---|---|
| Internal | 327 | 16.4 |
| External | 1,672 | 83.6 |
| **Complaint Sustained?** | 1,999 | 100.0 |
| Yes | 253 | 12.7 |
| No | 1,746 | 87.3 |
| If ACPO reviewed ACPD's internal affairs investigation (i.e. refer and respond case), then did ACPO approve the investigation by taking no further action? | 1,999 | 100.0 |
| Yes | 988 | 49.4 |
| No | 8 | .4 |
| N/A | 1,003 | 50.2 |
| Did any ACPD supervisor not concur with the IA investigator's original finding? | 1,999 | 100.0 |
| Yes | 36 | 1.8 |
| No | 1,963 | 98.2 |
| Did the complainant/victim receive medical attention? | 1,999 | 100.0 |
| Yes | 615 | 30.8 |
| No | 1,384 | 69.2 |
| Was the officer working a special employment detail? | 1,999 | 100.0 |
| Yes | 152 | 7.6 |
| No | 1,847 | 92.4 |
| If the officer was working a special employment detail, then did the establishment serve alcohol? | 1,999 | 100.0 |
| Yes | 145 | 7.3 |
| No | 30 | 1.5 |
| N/A | 1,824 | 91.2 |
| Was the officer formally interviewed? | 1,999 | 100.0 |
| Yes | 261 | 13.1 |
| No | 1,738 | 86.9 |
| Did the investigator report that an interview took place, but the file does not contain any substantive evidence of an interview? (e.g., transcript, questions/answer, CD, DVD, audio or video recording, etc.) | 1,999 | 100.0 |
| Yes | 160 | 8.0 |
| No | 1,839 | 92.0 |

i. **Complaints by Year.** Complaints against ACPD officers were highest in 2009 (n=508), before declining to 294 in 2010. Each year thereafter there was continual increase from the previous year; 2011 (+20.7%), 2012 (+10.4%) and 2013 (+14.8%) with an average increase of 15.3% between 2011 and 2013. Despite the decline between 2009 and 2010, complaints showed a general upward trend across all years as shown by the vertical linear trend line in figure 1 beginning in 2009. Stated differently, the single-year decline (from 2009 to 2010) was not sufficient to produce a downward trend, in fact, just the opposite was occurring—complaints were trending toward an increase (figure 1).



**Figure 1, Yearly Trend in Complaints Atlantic City Police Department 2009-2013**

ii. **Complaint Types.** Between 2009 and 2013, the ACPD accumulated 1,999 complaints arising from 778 individual cases. The complaints were not evenly distributed; the leading complaints were "other rule violation" (n=698) followed closely by excessive force (n=456) and demeanor (n=224). Just four types of complaints (28.6%) accounted for 76.4% of all complaints (indicated by the shaded rows in table 12). Extending the risk analysis further, half of the complaints types (50.0%) account for almost 91% (90.8%) of all complaints (indicated by the shaded cells). The ACPD demonstrated a clear pattern of complaints arising over the analysis period, most of which dealt with a physical confrontation (excessive force, assault, improper arrest, improper search) or with actions that affect legitimacy and community perception (demeanor, harassment). Had the Chief of Police and the command staff prioritized the effort to address the most common complaints—those shown here—then they may have discovered additional patterns such as repeat officers, repeat supervisors or repeat locations, which could have been part of an improvement plan. This is why the New Jersey

Page | 49

Attorney General specifically identifies the need to track and take action against mounting complaints and specific officers.

Table 12

*Atlantic City Police Department Complaint Analysis by Type of Complaint (n=1,999)*

| Complaints | n | % | Cumulative % | Cumulative % of Complaints |
|---|---|---|---|---|
| Other Rule Violation (Includes Neglect of Duty, Standard of Conduct, Improper Procedure ) | 698 | 34.9% | 34.9% | 7.1% |
| Excessive Force | 456 | 22.8% | 57.7% | 14.3% |
| Demeanor | 224 | 11.2% | 68.9% | 21.4% |
| Improper Search | 150 | 7.5% | 76.4% | 28.6% |
| Improper Arrest (Includes False Arrest) | 121 | 6.1% | 82.5% | 35.7% |
| Harassment (Includes Verbal Abuse, Threats) | 98 | 4.9% | 87.4% | 42.9% |
| Assault (Includes Sexual Assault) | 69 | 3.5% | 90.8% | 50.0% |
| Theft | 65 | 3.3% | 94.1% | 57.1% |
| Discrimination (Includes Disparaging Remarks, Differential Treatment, Racial Profiling) | 30 | 1.5% | 95.6% | 64.3% |
| Improper Entry | 25 | 1.3% | 96.8% | 71.4% |
| Other Criminal Violation (Includes Sexual Abuse, Criminal Mischief, Child Abuse, Official Misconduct, Terroristic Threats) | 25 | 1.3% | 98.1% | 78.6% |
| Domestic Violence | 24 | 1.2% | 99.3% | 85.7% |
| Improper Stop | 13 | 0.7% | 99.9% | 92.9% |
| Improper Procedure | 1 | 0.1% | 100.0% | 100.0% |
| **Total** | **1,999** | **100.0%** | | |

iii. **Sustained Rates for Excessive Force and Improper Arrest.** The rate of sustained complaints for excessive force is exceptionally low, comparted to national statistics (Hickman, 2006, tables 2 and 3, p.). The Atlantic City Police Department had an average 360.8 officers between 2009 and 2013.[9] For a comparable agency of this size (250-499 officers), the national rate of sustained complaints for use of force 12.0%; the rate of sustained complaints in Atlantic City was .219%. The rate of sustained complaints for use of force for municipal police agencies—of which Atlantic City is one—was 8.0%. The sustained rate for improper arrest in Atlantic City is 1.7% (table 13).

---

[9] Based on data submitted to the FBI Uniform Crime Report, Table 78, Full-time Law Enforcement Employees by City, for each year (2009-2013).

Table 13
*Sustained Rates for Excessive Force and Improper Arrest (n=577)*

| Complaint Type | | Sustained (yes or no) | | Total |
| --- | --- | --- | --- | --- |
| | | Yes | No | |
| Excessive Force | n | 1 | 455 | 456 |
| | % | .2% | 99.8% | 100.0% |
| Improper Arrest | n | 2 | 119 | 121 |
| | % | 1.7% | 98.3% | 100.0% |
| Total | n | 3 | 574 | 577 |
| | % | .5% | 99.5% | 100.0% |

iv. **Internal and External Complaints (source) and Sustained Complaints (disposition).** Most complaints were generated from external sources (83.6%) compared to those generated internally (16.4%). Most complaints were not sustained (87.3%). When examining the data further for a relationship between the source of the complaint (internal vs. external) and the disposition (sustained yes/no), another pattern emerges. Table 14 shows the relationship between these variables using the chi-square test of independence.

Table 14
*Sustained Complaints by Complaint Source (n=1,999)*

| Disposition | | | Complaint Source | | Total |
| --- | --- | --- | --- | --- | --- |
| | | | External | Internal | |
| Sustained (yes or no) | Yes | n | 51 | 202 | 253 |
| | | Expected n | 211.6 | 41.4 | 253.0 |
| | | % of Total | 2.6% | 10.1% | 12.7% |
| | | Standardized Residual | -11.0 | 25.0 | |
| | No | n | 1621 | 125 | 1746 |
| | | Expected n | 1460.4 | 285.6 | 1746.0 |
| | | % of Total | 81.1% | 6.3% | 87.3% |
| | | Standardized Residual | 4.2 | -9.5 | |
| Total | | n | 1672 | 327 | 1999.0 |
| | | Expected n | 1672.0 | 327.0 | 1999.0 |
| | | % of Total | 83.6% | 16.4% | 100.0% |

$\chi(1) = 853.209$, $p<.000$, $V=.653$

There is a statistically significant relationship ($p<.000$) with a very strong positive association ($V=.653$), where internal complaints are more likely to be sustained than external complaints (as indicated by the positive standard residual +25.0, shaded cell). Said differently, external complaints (those generated by citizens) are less likely to be sustained than those generated by someone inside the ACPD. This means the outcome of an investigation (sustained or not) depends, at least partly, on the source of the complaint